# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JANE INSINGA,** : | |
| **Plaintiff** : | **CIVIL ACTION NO. 1:04-1002** |
| v. : | **(CONNER, D.J.)** |
| | **(MANNION, M.J.)** |
| **JO ANNE B. BARNHART,** : | |
| **Commissioner of Social** | |
| **Security,** : | |
| **Defendant** : | |

## REPORT AND RECOMMENDATION

The record in this action has been reviewed pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to determine whether there is substantial evidence to support the Commissioner's decision denying the plaintiff's claim for Supplemental Security Income, ("SSI"), under Title XVI of the Social Security Act, ("Act"). 42 U.S.C. §§ 1381-1383f.

Based upon a review of the record, it is recommended that the plaintiff's appeal from the decision of the Commissioner of Social Security, (Doc. No. 1), be **DENIED.**

## I. Procedural Background

On December 23, 2002, the plaintiff filed an application for SSI benefits in which she alleged disability since September 1, 2001, due to a seizure disorder, chronic back pain syndrome and a history of kidney stones. (TR. 14, 44). After her claim was denied (TR. 29-32), the plaintiff's application

eventually came on for a hearing before an administrative law judge ("ALJ"), on December 2, 2003. (TR. 184-211).

On January 13, 2004, the ALJ issued a decision in which he found that the plaintiff had not engaged in substantial gainful activity subsequent to the alleged onset of disability; the plaintiff's impairments placed significant restrictions on her ability to perform basic work-related activities; the plaintiff did not have an impairment, or combination of impairments, severe enough to meet or equal the criteria for establishing disability under any applicable listed impairment set forth in Appendix I, Subpart P, Social Security Administration Regulation No. 4; the plaintiff was a 47 year old younger individual who had a limited 10th grade education and whose past relevant work provided the plaintiff with no transferable skills appropriate to the plaintiff's functional capacity; a significant number of acceptable jobs existed in the regional, state and national economies for a person such as the plaintiff; and the plaintiff had not been under a disability, as defined in the Social Security Act, as amended, at anytime relevant thereto. (TR. 19).

Plaintiff filed a request for review of the ALJ's decision. (TR. 7-8). The Appeals Council concluded that there was no basis upon which to grant her request for review. (TR. 4-6). Thus, the ALJ's decision stood as the final decision of the Commissioner.

Currently pending before the Court is the plaintiff's appeal of the decision of the Commissioner of Social Security filed on May 6, 2004. (Doc. No. 1).

**II. Disability Determination Process**

A five step process is required to determine if an applicant is disabled for purposes of social security disability insurance.  The Commissioner must sequentially determine:  (1) whether the applicant is engaged in substantial gainful activity; (2) whether the applicant has a severe impairment; (3) whether the applicant's impairment meets or equals a listed impairment; (4) whether the applicant's impairment prevents the applicant from doing past relevant work; and (5) whether the applicant's impairment prevents the applicant from doing any other work.  See 20 C.F.R. § 416.920 (2000).

The instant action was ultimately decided at the fifth step of the process when the ALJ determined that the plaintiff was "incapable of performing all past relevant work, but retained the functional capacity to perform a wide range of sedentary work."  (TR. 15).

**III.  Evidence of Record**

The plaintiff was born on February 16, 1956 and was forty-seven (47) years old at the time of the ALJ's decision. (TR.14, 44).  Her past work experience includes employment as a real estate broker.  (TR. 18, 53).  The plaintiff has a tenth grade education.  (TR. 14, 58).

The medical evidence of record establishes that on December 27, 2001, Ben Schecter, M.D., a family practitioner, opined that Plaintiff was temporarily disabled from November 18, 2001, through April 18, 2002, due to pneumonia. (TR. 85).

3

On April 9, 2002, Dr. Schecter opined that Plaintiff was temporarily disabled until October 19, 2002, due to a breast mass. (TR. 87). On April 15, 2002, the plaintiff underwent a lumpectomy (TR. 89), which revealed that the breast mass was "totally benign." (TR. 93).

On May 2, 2002, Plaintiff had a pelvic ultrasound which was normal except for a non-obstructing kidney stone. (TR. 143). Plaintiff reported a history of fainting spells and Hepatitis B to Michael A. Eufemio, Jr., M.D., a urologist. (TR. 98). Dr. Eufemio noted that Plaintiff's kidney stone was "asymptomatic." (TR. 99). Plaintiff was instructed to pursue follow-up care if she began to experience pain as a result of the stone migrating. (TR. 97).

On October 7, 2002, Dr. Schecter opined that Plaintiff would be temporarily disabled until April 7, 2003 due to Hepatitis B. (TR. 95).

An MRI report dated January 14, 2003, indicated that there was straightening of the normal lumbar lordosis. (TR. 105). Mild developmental spinal stenosis was identified and mild diffuse disc bulges were seen at L4-L5 and L5-S1, with facet hypertrophic degenerative changes. (TR. 105). There was also mild neuro-foraminal narrowing at L4-L5 and significant neuro-foraminal narrowing at L5-S1. (TR. 105). An MRI of the brain was generally unremarkable, except for possible chronic small vessel ischemic changes in the right posterior frontal lobe. (TR. 106). An EEG was also normal. (TR. 108).

An x-ray report of the lumbar spine from January 15, 2003, indicated multi-level degenerative changes, the worse being at L5/S1. (TR. 104). The

4

x-ray of the thoracic spine indicate degenerative change. (TR. 103). An x-ray of the cervical spine on January 15, 2003 also indicates degenerative change and osteophytes at C4-C5, C5-C6 and C6-C7 but the cervical spine was normal in height and alignment with no fracture or subluxation. (TR. 102).

On January 28, 2003, Akos K. Santha, M.D., found that the claimant had mild right hemiparesis[1] with diminished fine finger movements in the right hand. (TR. 153). Plaintiff denied any episodes of blacking-out since her last examination. (TR. 153). Plaintiff had not taken Naproxen as prescribed because she was afraid it would be contraindicated by her liver condition. (TR. 153). Dr. Santha again prescribed Naproxen for pain and observed that Plaintiff's seizures were under control with Trileptal. (TR. 154).

An EMG of Plaintiff's legs performed on February 10, 2003, was normal. (TR. 115). On February 12, 2003, Dr. Yevgeniy (Eugene) Isayev, M.D., one of Dr. Santha's associates, agreed with the original diagnosis of right upper extremity weakness with discomfort, pain and functional component. He found no "true weakness on the right side" and noted that two EEGs performed were unremarkable. (TR. 151). Plaintiff reported having one episode of blacking out since her last examination. (TR. 150). Dr. Isayev agreed with Dr. Santha's prescription of Naproxen and prescribed physical therapy. (TR. 151). Dr. Isayev concluded that Plaintiff was stable from a neurological perspective. (TR. 152).

---

[1] Hemiparesis: Weakness affecting one side of the body. Steadman's Medical Dictionary, 27th Ed., p. 800 (2000).

On March 18, 2003, Dr. Isayev indicated that the MRI of the lumbosacral spine showed developmental stenosis and diffuse disc bulges L4-L5, L5-S1. Cervical and thoracic x-rays were done and also showed some degenerative changes. (TR. 148). The doctor noted the plaintiff's evident spondylosis[2] of cervical, thoracic and lumbar spine, pain and discomfort.  (TR. at 149). The plaintiff denied any further black out episodes. (TR. 148).  She was to begin physical therapy on April 20, 2003, continue taking Trileptal, and start taking Vioxx for headaches. (TR. 149). Dr. Isayev indicated that Plaintiff may be experiencing drowsiness and lightheadedness due to taking Trileptal, but that these symptoms should resolve with time. (TR. 149).

Plaintiff stopped taking Trileptal in early April 2003, due to lightheadedness and drowsiness. She had no focal deficits in her arms or legs and was to continue taking Vioxx and add Norflex. Plaintiff also reported that she usually "passed-out" when she was anxious or extremely nervous; Her physician opined that this could be associated to panic attacks with hyperventilation and syncope. (TR. 147). On May 7, 2003, an EEG was performed and the results were normal.  (TR. 175).

At the hearing, the plaintiff testified that her most severe medical condition is her seizures disorder but what bothered her the most was the neck and back pain. She stated that the seizures started sometime in the year

---

[2]   Spondylosis: Degenerative arthritis, osteoarthritis of the cervical or lumbar vertibrae and related tissues. Taber's Cyclopedic Medical Dictionary, 17th Ed., p. 1948 (2001).

2000 and explained that she simply passes out and her family had found her unconscious on the floor. (TR. 191, 192-193). Plaintiff stated that she had stopped Trileptal because it made her feel lightheaded and drowsy. (TR. 192).

Additionally, the plaintiff testified that she suffers from severe headaches, shoulder and neck pain, and back pain. (TR. 193). The plaintiff stated that she cannot sit longer than forty-five (45) minutes without getting lower back pain. (TR. 193).

With regards to her daily activities, the plaintiff stated that she gets-up at around 5:30 AM to help her son get ready for school. (TR. 195). Her husband, who is disabled, does most of the house work. (TR. 196). She stated that she can lift no more than three pounds. (TR. 197). Plaintiff also stated that, although the complex where she lives has a swimming pool and tennis courts, she did not practice any sports or recreational activities. (TR. 198). Plaintiff testified that, other than sleepiness, she has no negative side effects from her medications. (TR. 199). She has a history of hepatitis A and B and kidney stones. (TR. 200-01).

With regards to the VE's testimony at the hearing, the ALJ asked the VE to assume a hypothetical individual of plaintiff's age, education and work experience, who could lift ten pounds occasionally and two to three pounds frequently; required a sit/stand option at forty-five minutes intervals; and had to take seizure precautions, such as avoid driving or climbing. (TR. 207). The VE responded that such an individual could perform the jobs of hand-packer

7

(2,000[3]), hand assembly (3,000), inspector for computer parts (1,800), and stuffing, labeling and addressing envelopes (2,500). (TR. 208).

## IV.  Discussion

Plaintiff first states that the ALJ erred in determining that she was able to perform a wide range of sedentary positions because her medical condition prevents her from performing substantial gainful activity. (Doc. 7, p. 2). Specifically, the plaintiff argues that because she has right side weakness, she cannot perform the jobs listed by the VE such as hand-assembler, hand-packer, and print shop worker. (Doc. 7, p. 4).

The medical evidence shows that the plaintiff had mild right-side weakness. However, as stated above, on February 12, 2003, Dr. Isayev opined that there was no "true weakness" on the plaintiff's right side. (TR. 151). In addition, the VE excluded those jobs which require fine finger dexterity, such as collating, from the list of jobs that the plaintiff could perform. (TR. 208; Doc. 8, p. 12).

The Commissioner argues, and we agree, that even eliminating all hand packer and hand assembler jobs, the plaintiff would still be able to work as a visual inspector. According to the VE, there are 1,800 such jobs available in the local economy. See *Craigie v. Bowen*, 835 F. 2d 56, 58 (3d Cir. 1987) (holding that 200 jobs in the region is a significant number of jobs). (Doc. 8,

---

[3]     Denotes number of jobs available in northeast Pennsylvania.

p.13).

Additionally, the plaintiff argues that since her driver's license had been revoked because of her seizure disorder (TR. 79, 169), she would be unable to drive to a work-site and that there is no public transportation near her house. (Doc. 7, p. 4). However, the regulations do take into account a plaintiff's ability to travel to and from a worksite but only in the context of a claimant's locomotive difficulties rendering it impossible, or extremely difficult, for her to physically move her body from home to work. Lopez Diaz v. Secretary of Health, Education and Welfare, 585 F.2d 1137, 1140 (1st Cir. 1978). (Doc. 8, p. 15).

The Commissioner must determine solely whether an individual can engage in any kind of "substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which she lives, or whether a specific job vacancy exists for her, or whether she would be hired if she applied for work. 42 U.S.C. § 423(d)(2)(A).

> "Congress, tightening the definition of disability, eliminated consideration of travel difficulties when those difficulties were extrinsic to the claimed disability; the length and expense of commuting and the resulting inconveniences were no longer to influence a disability determination. Lafont v. Secretary, H.E.W., 363 F. Supp. 443, 444 (E.D. La. 1973). A person, otherwise able to work, is in effect offered a choice: he can choose either to commute the distance to his job or he can move closer and avoid the expense and inconvenience. Disability insurance is not available to fund his decision to live far from available jobs. See Kuszewski v. Weinberger, 368 F. Supp. 530, 532 (D. Kan. 1973)." Lopez Diaz, supra at 1140.

Plaintiff also challenges the ALJ's credibility determination arguing that

9

the ALJ erred when he found the plaintiff's testimony with regards to her subjective symptoms not wholly credible. The plaintiff states that the ALJ based his credibility finding on a misinterpretation of her testimony at the hearing that she helps get her son ready for school every morning.  (Doc. 7, p. 3; Doc. 8, p. 9).

The ALJ stated that he reached his credibility findings by, among other factors, comparing the plaintiff's testimony at the hearing with the objective medical evidence. (TR. 18). This is consistent with the provisions of 20 C.F.R. § 416.929(c)(2) (2003) (objective medical evidence is a "useful indicator to assist [the agency] in making reasonable conclusions about the intensity and persistence" of a claimant's symptoms). (Doc. 8, p. 10).

An ALJ is given great discretion regarding credibility determinations. Van Horn v. Schweiker, 717 F. 2d 871, 873 (3d. Cir. 1983).  While an ALJ must give weight to a claimant's subjective testimony of inability to perform even light or sedentary work, he only must do this when the claimant's testimony is supported by competent medical evidence. Schaudeck v. Commissioner of Social Security, 181 F. 3d 429, 433 (3d Cir. 1999). Plaintiff makes a general challenge to the ALJ's credibility findings, but fails to advance a valid argument that would warrant the disturbance of the ALJ's credibility determination.  A court should affirm an ALJ's credibility finding unless the Plaintiff can demonstrate that the ALJ was patently wrong. Herr v. Sullivan, 912 F.2d. 178, 182 (7th Cir. 1990).

Plaintiff also challenges the ALJ's determination that the plaintiff's

10

impairments do not meet or equal listings of impairments section 1.04 (Disorders of the Spine)[4]. The Commissioner argues that the plaintiff merely recites the x-ray findings and thus, failed to demonstrate how her back and neck pain meets or equals the criteria for listing 1.04. (Doc. 8, p. 15). We agree. The plaintiff's diagnostic tests, including x-rays, and her doctors' observations, do not show that she has an inability to ambulate or any motor, sensation or reflex loss. The fact that, arguably, plaintiff's back and neck disorder meets some of the criteria of section 1.04 does not qualify as a disabling impairment regardless of the degree of severity of her condition. Sullivan v. Zebley, 493 U.S. 521, 530 (1990) (Doc. 8, p. 15).

---

[4]   Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With: A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or C Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic non radicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C. F.R. pt. 404, subpt. P, app. 1, § 1.04. (Doc. 8, p. 16).

11

## V. Conclusion

Based on the foregoing, substantial evidence in the record as a whole supports the ALJ's findings. In accordance with the standard of review at 42 U.S.C. § 405, **IT IS RECOMMENDED THAT** the plaintiff's appeal of the decision of the Commissioner of Social Security (Doc. No. 1) be **DENIED.**

                            <u>**s/ Malachy E. Mannion**</u>

                            **MALACHY E. MANNION**
                            **United States Magistrate Judge**

**Dated**:     May 27, 2005

O:\shared\REPORTS\2004 Reports\04-1002.wpd